## NEW YORK CIRCUIT.
OCTOBER, 1846.
### Before EDMONDS, Circuit Judge.

JAMES HANLEY V. THE HARLEM RAILROAD COMPANY.

The law of passenger carriers as applied to railroads.

The company, being the owner of the road, as well as of the carriages, is bound to the same care, diligence and skill, as to the condition and construction of the road, as they are in regard to the carriages.

If the road is built on an embankment, or a side hill, the company is bound to take all due precautions against a carriage being precipitated down the declivity, either by widening the crown of the road, or erecting walls or railing sufficiently strong to prevent it.

When a train was passing over an embankment, by an accident the wheels were thrown off the track, and the car, with the passengers, was thrown down the declivity, whereby the plaintiff was hurt; *held*, that he was entitled to recover, because the company had taken no precautions, by widening the road, or by the erection of suitable barriers, to prevent a car thus being thrown down the side of the embankment.

THIS was an action on the case, for injuries caused to the plaintiff by the overturning of one of the defendants' railroad cars in which the plaintiff was a passenger.

On the 30th of September, 1844, while the train, consisting of a locomotive, a baggage car, and two passenger cars, was proceeding from New York, at the rate of from ten to fifteen miles an hour, the front axle of the rear passenger car broke, and after being dragged some distance the car overturned and was precipitated down an embankment. There were about fifty passengers in the car at the time of the accident, and the train was attended by an engineer, a fireman, a conductor and a brakeman. The accident was caused by the fore wheels attached to the broken axle working under those immediately behind, and throwing them off the track. By the breaking of the axle the forward part of the car became depressed, and a jar was felt, which a witness described to be like a motion of jumping from one cross piece to another, or going over stones. There was no string through the cars for the purpose

of communicating signals to the engineer, but the conductor, immediately on feeling the jar, called to the engineer, who immediately reversed the engine, which stopped after running from 100 to 150 feet.  There were brakes attached to the wheels at each end of the car, but there was only one brakeman with the train, who was on the forward platform of the car, and the brake there operating only on the wheels attached to the broken axle, was entirely useless.  The car fell over on one side, then rolled on its top, and finally settled down on the other side.  The embankment was about fifty feet high, and in width, at the crown or top, did not extend above twelve or eighteen inches beyond the rails; and there was no wall, railing, or other protection, in case of the cars running off the track, to prevent the cars going down the precipice. Evidence was given to show the railroad to be in a bad state of repair near where the accident occurred.  The axle consisted of two pieces welded together, and the break in it was clean and without any splinters.

Several of the passengers were injured.  The plaintiff was found partly under the overturned car, with severe wounds and contusions of the head, and a compound fracture of the right leg just below the knee joint.  He was removed to the city hospital, where he remained for six or seven weeks, and went out on crutches.  The splints were removed about six weeks after the accident, at which time there was considerable irritation, and several ulcers about the leg, which required surgical attendance for several months after the plaintiff left the hospital.

The plaintiff was a master harp maker, and worked at his business before the accident, but had not been able to do so since.  It was proved that he was of the first order in his line of work, which required great nicety and skill; that seven-eighths of that work is done at a lathe, requiring the use of both feet to perform its motions, and that the same mind must be applied to the motions of the lathe and the use of the tools.

*The Plaintiff's Counsel* proposed to ask a witness "how

James Hanley v. The Harlem Railroad Company.

many harp makers are there in this country?" which was objected to by the defendant's counsel.

*The Judge* disallowed the question, and the plaintiff's counsel excepted.

The question — "Does your acquaintance with the business enable you to say whether in consequence of the small number it is profitable?" was also objected to and disallowed, and the plaintiff's counsel excepted to this decision.

For the defense, the conductor testified that immediately on the accident he called to the engineer, and had no difficulty in communicating with him, and that a string could not be used advantageously in such a train; that from the hind end of the last car no communication could be had with the engineer except by the brakes; that the usual number of attendants were with the train, and were sufficient for the purposes required. Evidence was also given that the car was good and well built; that on the morning of the day on which the accident happened, the car had been examined by a person in defendants' employ whose duty it was to see to its being in proper condition; that he rubbed his hand over the axle and found there nothing but a scale of the size of a sixpence; that breaking axles is no uncommon occurrence on railroads, and does not necessarily cause an upset; that the axle was made of iron called "Banks' best," which is imported only for railroad axles and large screws, and is considered the best for those purposes; that welded axles are considered as good as others, and that the one in question was new in June preceding the accident, and broke about four inches from the weld.

A blacksmith and machinist, called for the plaintiff, looking at the fracture, pronounced it to be bad, and testified that the axle could not be as good after being welded; that tough iron would splinter, and not break off clean like this fracture.

*The Circuit Judge* charged, that the law required all public carriers of passengers to provide conveyances reasonably

strong and sufficient for the purpose, and to make a proper examination thereof previous to each journey, and on failure of any of these particulars, they are responsible for any injuries that may happen to a passenger; that if there is any defect in the construction of any part of the carriage, which may be out of sight and not discoverable on an ordinary examination, yet if the defect might be discovered by a more minute examination, and any damage happen to a passenger by reason thereof, the carrier is liable. That railroad companies were public carriers, and the same rules of law were applicable to them as to other carriers. That the use of railroads being new, and in a course of gradual development, and their increased speed, and other circumstances rendering them liable to accidents from which ordinary carriages were free, the same principle of law must be applied to any changes which may take place in their mode and rate of traveling, so that full and ample protection may always be afforded to the public. That as owners of the road they are subject to a responsibility from which ordinary carriers are exempt, namely, for accidents happening through defective construction or an unsound state of repair of the road—that in questions relating to the construction and state of repair of the road, the same principle held good as before stated with regard to the make and repair of carriages; and, further, that the law imposed on them the duty of guarding their passengers, so far as in their power, from accident. That in the construction of bridges and embankments, where the effect of an accident, or running off the track, was accompanied with more than ordinary danger to the passengers, it was the duty of railroad companies, by the erection of fences or walls, or otherwise, to provide necessary safeguards commensurate with the increased peril.

That they were also bound to provide careful engineers, conductors, brakemen and other necessary attendants of reasonable skill and good habits, and in sufficient number for the protection of the passengers.

The cause of the injury to the plaintiff was the breaking of

the axle, and the wheels attached to it working under those in the rear, by which the car ran off the track and was precipitated down the slope of the embankment. The jury would have to consider whether this was owing to any want of skill or care by defendants or their servants or agents. In this they must consider: First, the state of the road — was it in such a state of repair as the law required? Second, the breaking of the axle. It was said by the defendants' counsel that this did not hurt the plaintiff; but it was one of the causes of the injury and must therefore be kept in view by the jury. The defendants' witnesses testified that it was made of the best of iron, and on the other hand a witness had said that tough iron would not break clear off as this had done. The mode of its construction must also be considered — it was welded together. The jury would also determine whether there was any defect in the axle which, though latent, might have been discovered by minute and diligent examination. If there was, the defendants had not fulfilled their duty in that respect to the plaintiff. Third, as to the stoppage of the train; there was no string to communicate with the engineer. Was this requisite? It is said that a signal was nevertheless given as quick as if there had been one. The jury would consider whether, through the want of a string or other contrivance, the peril was increased? Fourth, were there sufficient attendants with the train? It was in evidence that there was a break in the rear of the overturned car, and that no brakeman was there or on the forward car. The brakes were not available, because the only brakeman was at that which the accident rendered useless. Was, then, one brakeman a sufficient protection to the passengers? Lastly, there was no barrier whatever at the side of the road where the accident happened. He had before instructed the jury that where the construction of the road causes an increase of risk, the defendants were bound to provide increased protection. Suppose a public bridge to be built without sides, or a turnpike down the side of a hill, without any fence or barrier, would travelers in either case be properly or adequately protected?

These questions were to be tested, not by rules of economy, but with regard to the value of human life, and in reference to the practicability of the necessary safeguards. The defendants, as public carriers, and owners and builders of the road, were bound to fulfill all the obligations which the law cast on them, and which by their business they took on themselves; and if the jury were of opinion that they had failed in any one particular or more, and thereby the plaintiff had sustained an injury, or the injury to him had been increased, he was entitled to a verdict; and if the jury found for him they should, in estimating the damages, take into consideration his loss of business, and the duration of the effects of the injury, which the medical witness had testified would last for life.

The jury returned a verdict for plaintiff. Damages, $795.

*S. Sherwood* and *S. B. H. Judah*, for plaintiff.

*C. W. Sandford* and *C. O'Conor*, for defendants.

---

## NEW YORK CIRCUIT.
### NOVEMBER, 1846.
### Before EDMONDS, Circuit Judge.